**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Telesaurus VPC, LLC, a Delaware limited liability company,<br><br>　　　　　　　Plaintiff,<br><br>vs.<br><br>Randy Power, an individual; Patricia Power, an individual; Radiolink Corporation, an Arizona corporation; and commonly-controlled and affiliated entities,<br><br>　　　　　　　Defendants. | No. CV07-1311-PHX-NVW<br><br>**ORDER** |

Before the Court is Defendants' Motion for Summary Judgment (Doc. 193). For the reasons stated below, the motion will be granted.

**I.     BACKGROUND**

**　　A.     Genesis of this Dispute**

In 1998, Telesaurus (a Delaware limited liability company) and RadioLink (an Arizona corporation) both participated in an FCC auction for certain radio frequencies in the Phoenix area designated as VHF Public Coast, or "VPC," frequencies. Telesaurus won the auction, but RadioLink soon gained access to the frequencies anyway by allegedly "submit[ting] to the FCC a false application . . . falsely characterizing [five of Telesaurus's VPC frequencies] as frequencies in a certain pool of frequencies (very close in frequency range to the VPC Frequencies) that the FCC set aside for licensing at no charge, on a first-come, first-serve basis." (Doc. 120 ¶ 15.) RadioLink denies that it submitted a false application, and instead claims that a frequency coordinator (a non-

governmental entity that works as a sort of middleman for frequency applications) mistakenly requested Telesaurus's frequencies on RadioLink's behalf. In any event, the FCC did not realize that the requested frequencies were already assigned to Telesaurus, and it granted RadioLink's application. RadioLink began using Telesaurus's frequencies allegedly "for a common carrier Wireless Telecommunication Service and Commercial Mobile Radio Service." (*Id*. ¶ 16.) RadioLink disputes that it operated a commercial mobile radio service, instead arguing that it operated a private mobile radio service for customers such as fire departments and bus systems. The distinction between a commercial service and a private service matters because the FCC treats commercial services, but not private services, as "common carriers," 47 U.S.C. § 332(c)(1)–(2), and (as discussed below) RadioLink's liability turns on whether or not it was a common carrier.

Telesaurus apparently paid no attention to its VPC frequencies for several years, and had no idea that RadioLink was using them until 2003 or 2004. Administrative proceedings with the FCC ensued. In 2005, the FCC modified RadioLink's license to exclude Telesaurus's five frequencies and include five replacement frequencies.

### B. Initial Stages and Appeal

Telesaurus initiated this lawsuit in 2007, alleging that RadioLink had used Telesaurus's frequencies without permission from 1999 through 2005, thus supposedly violating the common carrier provisions of the Federal Communications Act (FCA), *see* 47 U.S.C. § 207, and entitling Telesaurus to unspecified damages.[1] Telesaurus also asserted state-law torts. RadioLink eventually moved to dismiss, arguing that it was not a common carrier as a matter of law, and therefore 47 U.S.C. § 207 could not apply. RadioLink also argued that Telesaurus's state-law claims were preempted by federal law.

---

[1] According to counsel, Telesaurus suffered no losses from RadioLink's actions, but rather seeks damages measured by RadioLink's profits from using the VPC frequencies, similar to equitable disgorgement. (*See* Doc. 115 at 23–25.)

This Court granted RadioLink's motion, holding that RadioLink was not a common carrier as a matter of law, and that the FCA preempts the state-law claims. On appeal, the Ninth Circuit upheld the preemption conclusion, but not the common carrier conclusion. Nonetheless, the Ninth Circuit agreed that Telesaurus's then-operative complaint did not sufficiently allege common carrier status. The Ninth Circuit therefore remanded to give Telesaurus an opportunity to amend its complaint.

### C. Development of a Focused Discovery and Summary Judgment Procedure

The Ninth Circuit's order established the following elements for common carrier status:

> [A] mobile service provider such as RadioLink qualifies as a "common carrier" under the FCA only to the extent it is "engaged in the provision of a service" that is: (1) for profit; (2) interconnected (or pending interconnection) with the public switched network; and (3) available to the public or other specified users.

*Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1004 (9th Cir. 2010). Telesaurus's second amended complaint, filed in January 2011, tracked this language fairly closely, but was devoid of supporting facts. RadioLink again moved to dismiss.

At a hearing on that motion in April 2011, the court stated that "those facts going to 'available to the public or other specified users,' or 'interconnected to the public switched network,' appear to be readily amenable to quick economical and definitive discovery and resolution." (Doc. 143 at 5.) The Court surmised that the parties "might need some depositions. But most of this would appear . . . to be paper discovery." (*Id*. at 17.) Referring to RadioLink's transmitter site, counsel for Telesaurus added: "I could envision a site inspection by an expert. I believe there's going to be some disagreement as to what the equipment can or can't do . . . during this five- or six-year period [in which RadioLink allegedly violated Telesaurus's rights]." (*Id*. at 18.)

Based on the discussion at the hearing, the Court denied RadioLink's motion to dismiss and instead ordered the parties to develop a discovery plan focused only on the

second and third elements of the Ninth Circuit's common carrier test, to be followed by cross-motions for summary judgment on those elements. (Doc. 138.) After delays occasioned by the parties' other motions, the parties agreed on a scheduling order requiring RadioLink to file a motion for summary judgment regarding interconnectedness and availability to the public. That motion was to include

> a written description in the form of a functional diagram of RadioLink's operating system during the period from 1999 through the time in 2005 when its frequencies were changed, with sufficient detail to allow a third party, including [Telesaurus]'s expert witness, if any, to determine whether the system was interconnected with the public switched network . . . .

(Doc. 189 at 2.) The scheduling order went on to specify:

> During January, 2012, (A) Defendants will permit inspections by duly qualified experts, at mutually convenient dates as follows: (i) Site inspection of RadioLink's [repeater] facility, and (ii) Inspection of RadioLink's repeater equipment in operation during the relevant time period, whether or not still operating; and (B) Plaintiff shall conduct the deposition of Randy Power at a date and time convenient to all parties, limited to the issues raised in Defendants' Motion for Summary Judgment. Plaintiff reserves the right to request additional discovery concerning the issues raised by Defendant's Motion for Summary Judgment pursuant to Rule 56(d) Fed.R.Civ.P. following its review of the Motion, and Defendants reserve the right to object to any such requests.

(*Id.*)

Telesaurus was required to obtain new counsel in the midst of summary judgment briefing, causing delays. In the end, Telesaurus deposed Randy Power, but "decided to forgo [an] inspection [of RadioLink's repeater site] since none of the equipment RadioLink used during the relevant time period remains at the site." (Doc. 223 at 2.) Telesaurus cites nothing in support of the assertion that none of the relevant equipment remains in place.

- 4 -

## II. LEGAL STANDARD

Summary judgment is warranted if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the nonmoving party would bear the burden of persuasion at trial, the moving party may carry its initial burden of production by submitting admissible "evidence negating an essential element of the nonmoving party's case," or by showing, "after suitable discovery," that the "nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1105–06 (9th Cir. 2000).

When the moving party has carried its burden, the nonmoving party must respond with specific facts, supported by admissible evidence, showing a genuine issue for trial. *See* Fed. R. Civ. P. 56(c). But allegedly disputed facts must be material — the existence of only "*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).

Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, the nonmoving party's properly presented evidence is presumed to be true and all inferences from the evidence are drawn in the light most favorable to that party. *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1289 (9th Cir. 1987).

## III. ADMISSIBILITY OF EVIDENCE

A party may object that the evidence cited by the other party in support or opposition to summary judgment "cannot be presented in a form that would be

admissible in evidence." Fed. R. Civ. P. 56(c)(2). "While the evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial, the proponent must set out facts that it will be able to prove through admissible evidence." *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010).

### A. Evidence Submitted by RadioLink

Telesaurus claims that certain documents submitted by RadioLink related to its FCC applications (Doc. 194 at 11–26) are hearsay. This motion can be resolved without reference to those documents. The Court will therefore not rule on Telesaurus's hearsay objections.

### B. Evidence Submitted by Telesaurus

#### 1. BLM Documents

RadioLink challenges the authenticity of documents Telesaurus obtained from the Bureau of Land Management (Docs. 210-2 through 210-8). Telesaurus submitted nothing from the BLM's custodian of records to authenticate the BLM documents. However, it is not impossible for these documents to be authenticated, especially if this case went forward to full discovery. In addition, at his deposition, Power authenticated certain of these BLM documents relating to himself and RadioLink. Therefore, the BLM documents relating directly to Power or RadioLink will not be excluded for lack of authenticity. The remaining BLM documents are irrelevant, and even if relevant, would be hearsay. They will be excluded.

#### 2. Havens Affidavit

RadioLink challenges an affidavit submitted by Telesaurus's principal, Warren Havens. "An affidavit or declaration used to support or oppose a [summary judgment] motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matter stated." Fed. R. Civ. P. 56(c)(4). Havens' affidavit fails this standard. It only summarizes attached documentary evidence (such as the BLM documents), none of

which substantiates his personal knowledge. Rather, he gained his knowledge *from* the documentary evidence. Accordingly, the Havens affidavit is inadmissible.

## IV. FACTS

Taking into account the foregoing, the following facts are undisputed unless attributed to one party or another.

### A. The VPC Frequencies and RadioLink's Equipment

As noted above, both RadioLink and Telesaurus competed in an auction in 1998 for certain VPC frequencies, which Telesaurus won. The following year, RadioLink gained overlapping rights to five of those frequencies, on which it transmitted under call sign WPOX212. RadioLink claims that the overlap was a mistake on the part of Industrial Telecommunications Association, a frequency coordinator authorized by the FCC to recommend appropriate frequencies in the private land mobile radio spectrum. In 2005, this conflict between Telesaurus's and RadioLink's rights came to light and the FCC deleted the five disputed frequencies from RadioLink's WPOX212 license, replacing them with other available frequencies.

According to a declaration from Randy Power, RadioLink's WPOX212 repeater equipment has never included the technology or other means necessary to interconnect with the public switched network — or in other words, to allow radio operators to place or receive phone calls from their radios. In addition, Power claims that RadioLink's service has never been offered to the general public. Rather, says Power, RadioLink selected its customers based on the repeater equipment's capacity, the potential customer's ability to obtain needed FCC permits, and the potential customer's ability to pay. RadioLink therefore claims that it has always operated as a private mobile radio service, rather than a commercial service.

### B. BLM Rent Calculations

RadioLink's repeater equipment sits on land owned by the Bureau of Land Management on White Tank Mountain, west of Phoenix. Randy Power has leased that land from the BLM since sometime in the 1980s. Not only has he placed RadioLink's

1 equipment on that land, but he has also sublet his facilities to certain other
2 communications providers.

3 Occasionally (usually once a year), Power is required to fill out a BLM form listing the "occupants" of the land he leases, the "type of use" for each occupant, and whether each occupant is a "customer" or "tenant." This form assists the BLM in calculating Power's rent. On every one of these forms filled out by Power from 1996 through 2011, Power identified the site's general "type of use" as a "commercial mobile radio service/facility manager" or just "commercial mobile radio service." Each tenant's specific type of use was listed as "CMRS" (commercial mobile radio service) or "BT" (broadcast translator), but every customer's type of use was listed as "PMRS" (private mobile radio service). (*See* Doc. 210-2 at 12, 21, 27, 33, 50, 59, 69, 89, 97, 103, 113; Doc. 210-3 at 7, 11, 16, 29, 44.)

### C. FCC Form 499-A

At some point, probably in the late 1990s and no later than 2001 (*see* Doc. 223-1 at 24), Power and his then-wife, Patricia, each filled out an FCC Form 499-A (Doc. 210-9 at 21–24). The FCC requires certain telecommunications providers to report revenue annually on Form 499-A so that the FCC can collect contributions used to fund various programs relating to telephone service. (*See* Doc. 223-1 at 89.) The Powers were in the midst of divorce proceedings at that time and to the best of Randy Power's recollection, they filled out these forms independently of each other because they both had certain FCC licenses in their own names.

Both Randy and Patricia stated on their Forms 499-A that they were "doing business as" "RadioLink Corp." Randy identified RadioLink's business as "other mobile," which is not listed as an available category on the form's instructions. Patricia identified RadioLink's business as "SMR [specialized mobile radio] (dispatch)," defined in the instructions as "primarily provid[ing] dispatch services and mobile services other than wireless telephony. While dispatch services may include interconnection with the

1  public switched network, this category does not include carriers that primarily offer
2  wireless telephony." (*Id*. at 99–100.)

3        When asked at his deposition to explain the discrepancy between his and his
4  Patricia's forms, Power stated: "[T]hat was a confusing time in my life [while going
5  through the divorce] and maybe she thought of one way and I thought of another. I don't
6  know. I can't answer that for sure." (*Id*. at 25.) Also at Power's deposition, Telesaurus
7  pointed out that the Powers could have identified RadioLink as being a "Private Service
8  Provider," defined on the form's instructions as "offer[ing] telecommunications to others
9  for a fee on a non-common carrier basis. This would include a company that offers
10  excess capacity on a private system that it uses primarily for internal purposes." (*Id*. at
11  99.) Power responded that RadioLink has never provided "telecommunications," but
12  only "dispatch." (*Id*. at 27.) Power speculated that he and his wife nonetheless filled out
13  these forms either as part of a transaction in which a cellphone company acquired certain
14  frequencies from the Powers, or because they operated another service in Phoenix in the
15  late 1990s with telephone interconnect. (*Id*.)

16  **V.   ANALYSIS**

17        **A.   Alleged Legal Presumption of CMRS**

18        The Ninth Circuit has made clear that liability in this case turns on RadioLink
19  being a "common carrier," and that common carrier status turns on the service that the
20  alleged common carrier actually provides:

21            [A] mobile service provider such as RadioLink qualifies as a
22            "common carrier" under the FCA only to the extent it is
          "engaged in the provision of a service" that is: (1) for profit;
23            (2) interconnected (or pending interconnection) with the
24            public switched network; and (3) available to the public or
          other specified users.

25  *Telesaurus*, 623 F.3d at 1004. Despite this, Telesaurus's primary argument here is that
26  RadioLink must be presumed to be a common carrier because it used the VPC
27
28

- 9 -

1 frequencies. Telesaurus raised essentially this same argument on appeal, and the Ninth
2 Circuit disagreed:

> Telesaurus argues that Radiolink must be deemed to be a common carrier because it was using the VPC Frequencies, which the FCC designated for use only by commercial mobile services. We reject this tautology. As explained above, the definition of "commercial mobile services" does not turn on the nature of the frequencies being used, but rather on whether the service being provided meets certain criteria.

*Id*. at 1005.

The only distinction Telesaurus makes now is to pile the elements of common carrier status into the argument. Telesaurus, for example, states that use of the VPC frequencies constitutes a commercial service *and* that commercial service operators must interconnect with the public switched network, *therefore* RadioLink must have interconnected. Telesaurus also points out the various FCC regulations that RadioLink supposedly violated by using the VPC frequencies for something other than a commercial service, insisting that RadioLink must therefore have been a commercial service. These arguments are no less tautological than the argument the Ninth Circuit rejected. They do not suffice to defeat summary judgment.

### B. Interconnection with the Public Switched Network

RadioLink has proffered evidence that WPOX212 (which included the VPC frequencies from 1999 to 2005) has never been interconnected with the public switched network. (*See* Doc. 194-1 at 4–7.) The burden therefore shifted to Telesaurus to bring forth evidence showing that a reasonable trier of fact could conclude otherwise. As explained below, Telesaurus has not met that burden.

#### 1. The Forms 499-A

Telesaurus leans heavily on the 499-A forms that Randy and Patricia Power had once filled out. Telesaurus located these forms in an online FCC database. They are the only two forms that Telesaurus has offered from that database. They do not create a dispute over a material issue.

First, their exact date is unclear. Telesaurus continually suggests that the forms were filled out in 2001, but it provides no citation for that. The forms themselves bear no date on which they were submitted to the FCC. Based on the business address listed on those forms and the nature of the forms themselves, Power speculated at his deposition that he and Patricia filled them out sometime in the late 1990s — meaning that they may have filled them out before RadioLink began using the VPC frequencies. If so, these forms would clearly have no relevance.

But even assuming that the Powers filled out these forms sometime after RadioLink began using the VPC frequencies, the relevance is still unclear. Telesaurus argues that because neither Randy nor Patricia Power selected "Private Service Provider" from a list of available types of telecommunications services in the 499-A instructions, an inference arises that RadioLink was not a private mobile radio service. But Telesaurus has not established, nor do its documents establish, that Form 499-A has anything to do the distinctions between commercial mobile radio services and private mobile radio services. The form's instructions list fifteen different types of services that the Powers could have selected. "Commercial mobile radio service" and "private mobile radio service" are not on that list. (Doc. 223-1 at 98–99.) The only option linguistically close to either of them is "Private Service Provider," defined as "offer[ing] telecommunications to others for a fee on a non-common carrier basis. This would include a company that offers excess capacity on a private system that it uses primarily for internal purposes." (Doc. 223-1 at 99.) If the FCC meant this definition to be coterminous with its definition of private mobile radio service, one could reasonably have expected it to say so. But it did not.

In addition, the types of service that Randy and Patricia Power listed for RadioLink do not suggest that RadioLink operated as a commercial service. Randy Power chose "other mobile," an option which does not exist in the 499-A instructions. "Other mobile" says nothing about the relevant characteristics of RadioLink's service. Patricia Power chose "SMR (dispatch)," which applies to those who "primarily provide[]

- 11 -

1  dispatch services and mobile services other than wireless telephony. While dispatch
2  services may include interconnection with the public switched network, this category
3  does not include carriers that primarily offer wireless telephony." (Doc. 223-1 at 99–
4  100.) This definition shows only that *if* RadioLink had provided telephone
5  interconnection, "SMR (dispatch)" might still have been the appropriate designation on
6  the 499-A. It says nothing about whether RadioLink ever provided interconnection.
7  Accordingly, the 499-A forms do not raise a dispute over whether RadioLink was ever
8  interconnected with the public switched network.

### 2. BLM Documents

Telesaurus also attempts to make much of the BLM paperwork documenting Power's yearly rent payments for the White Tank Mountain repeater site. Because, on the BLM documents, Power has consistently identified his use of the repeater site as "commercial mobile radio service/facility manager" or "commercial mobile radio service," Telesaurus argues that a material issue of fact exists about what sort of service RadioLink really offered. Telesaurus further asserts that listing oneself as a commercial service on these BLM forms raises a presumption that one is in fact a commercial service for FCC purposes, and therefore RadioLink must have been interconnected to the public switched network, with services offered to the public indiscriminately. Telesaurus is mistaken.

The BLM's regulations make clear that its definitions of "commercial mobile radio service" and "private mobile radio service" differ from the FCC's definitions:

> Commercial mobile radio service (CMRS)/facility manager means commercial mobile radio uses that provide mobile communication service to individual customers. Examples of CMRS include: Community repeaters, trunked radio (specialized mobile radio), two-way radio voice dispatch, public switched network (telephone/data) interconnect service, microwave communications link equipment, and other two-way voice and paging services. "Facility Managers" are grant or lease holders that lease building,

> tower, and related facility space to a variety of tenants and customers as part of the holder's business enterprise, but do not own or operate communication equipment in the facility for their own uses;
>
> * * *
>
> Private mobile radio service (PMRS) means uses supporting private mobile radio systems primarily for a single entity for mobile internal communications. PMRS service is not sold and is exclusively limited to the user in support of business, community activities, or other organizational communication needs. Examples of PMRS include: Private local radio dispatch, private paging services, and ancillary microwave communications equipment for controlling mobile facilities;

43 C.F.R. § 2801.5(b).

The most notable difference between these definitions and the FCC's definitions is that, for BLM purposes, a private mobile radio service "is not sold and is exclusively limited to the user." The FCC, by contrast, permits some private mobile radio services to operate on a for-profit basis with subscribers. *See* 47 C.F.R. § 20.3 (defining "Private Mobile Radio Service" to include, among other things, "[m]obile radio service offered to restricted classes of eligible users"). In addition, the BLM views "switched network (telephone/data) interconnect service" as an example of commercial mobile radio services, not as an element of such service. Thus, the BLM's definitions demonstrate that any FCC-designated "private mobile radio service" operating on a for-profit basis would fall under the "commercial mobile radio service" heading for BLM rent purposes. It is undisputed that RadioLink operated on a for-profit basis from 1999 to 2005. Accordingly, Power correctly identified the White Tank Mountain site as being used for a "commercial" service with respect to the BLM's rent calculations.

In addition, the BLM "calculates rents for * * * [m]ultiple-use facilities, whose authorizations provide for subleasing, by setting the rent of the highest value use in the facility or facilities as the base rent . . . ." 43 C.F.R. § 2806.31(a)(2). As far as the BLM documents disclose, the "highest value use" on the White Tank Mountain site was the

- 13 -

commercial mobile radio service offered by certain of Power's tenants. Accordingly, for this additional reason, Power correctly identified the White Tank Mountain site as being used for a "commercial" service with respect to the BLM's rent calculations.

However, Telesaurus has failed to demonstrate how the BLM's regulations have any relevance to whether RadioLink was a commercial service under the FCC's definition. Indeed, Telesaurus failed to address any of the foregoing authority. Nor does Telesaurus acknowledge that Power consistently listed all of RadioLink's customers (as opposed to other tenants on the site) as receiving private mobile radio services, just as RadioLink has claimed. (*See* Doc. 210-2 at 12, 21, 27, 33, 50, 59, 69, 89, 97, 103, 113; Doc. 210-3 at 7, 11, 16, 29, 44.) Thus, rather than casting doubt on RadioLink's assertions, the BLM documents offered by Telesaurus support RadioLink's position. They do not raise a genuine issue of material fact.

Because interconnection is a necessary element of Telesaurus's claim, and because it has failed to show that a genuine dispute exists as to that element, RadioLink is entitled to summary judgment.

### C. Availability to the Public

RadioLink has proffered evidence that WPOX212 has never been offered to "'the public or . . . to such classes of eligible users as to be effectively available to a substantial portion of the public.'" *Telesaurus*, 623 F.3d at 1004 (quoting 47 U.S.C. § 332(d)(1)) (alteration added). Power's declaration in support of summary judgment states:

> All of RadioLink's customers were selected on an individual basis and selectively allowed to use the Repeater System based on a) a determination that they met the criteria of being qualified as permitted from [certain] FCC rules . . . and b) an agreed upon price per unit per month based upon various criteria, including the total number of radios being used, the type of customer, the number of ID codes to be used in the customer's private fleet and other factors determined and applied in RadioLink's discretion. The selection of customers was discriminatory and limited by the capacity of the Repeater System. Among other things, RadioLink limited the

- 14 -

>    number of customers so that the Repeater System would not
>    be overloaded, thus allowing normal access to the radio
>    system without many if any "busy beeps."

(Doc. 194-1 at 7.)  At his deposition, Power testified that he develops business through "word-of-mouth" and "by responding to bids for two-way radio service that I might be able to provide for a school district or some entity that's looking for service." (Doc. 223-1 at 23–24.)

Telesaurus has offered no evidence refuting Power's claims. Because offering the service to the public or a substantial class of the public is a necessary element of Telesaurus's claim, and because it has failed to show that a genuine dispute exists as to that element, RadioLink is entitled to summary judgment on this basis as well.

### D.   Discovery Issues

Telesaurus has claimed that it cannot fully make its case because RadioLink has been hiding documents. This claim stems from requests for production that Telesaurus served on RadioLink (Doc. 211-1 at 3–20), to which RadioLink objected on various grounds, but also noted, with respect to certain requests, that no responsive documents exist. Concerning certain other requests, counsel for RadioLink directed Telesaurus to specific documents previously produced. As for Telesaurus's remaining requests (having to do with certain FCC proceedings), counsel stated that Telesaurus "can just as readily obtain any such documents, to the extent they exist, from the public records as can [RadioLink]." (*Id.* at 29–30.)

Telesaurus argues that RadioLink's response was disingenuous because Telesaurus found documents that RadioLink should have disclosed — referring to public documents such as the BLM rent paperwork and the 499-A forms. Telesaurus has provided no reason to think that these documents were in RadioLink's possession, and in any event Telesaurus has not been harmed because it obtained the documents anyway. To the extent Telesaurus believes that RadioLink is still hiding something, Telesaurus has never brought a motion to compel production.

Telesaurus had ample opportunity to conduct discovery in this case. The parties and the Court began developing this narrowed discovery and summary judgment procedure over a year ago. Although the scheduling order as between Telesaurus and RadioLink did not go into effect until last November, nothing prevented Telesaurus from conducting third-party discovery. For example, through its own efforts to obtain the BLM documents, Telesaurus learned of many of RadioLink's customers. It could have followed up by serving subpoenas on those customers to discover information relevant to the elements at issue here — such as whether those customers expected or received the ability to place phone calls through their radios. Telesaurus's failure to do so does not excuse its supposed inability to rebut RadioLink's evidence.

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (Doc. 193) is GRANTED.

IT IS FURTHER ORDERED that the Clerk enter judgment in favor of Defendants against Plaintiff, and that Plaintiff take nothing. The Clerk shall terminate this case.

Dated this 17th day of May, 2012.

_____
Neil V. Wake
United States District Judge